## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION and AMERICAN CIVIL LIBERTIES UNION FOUNDATION,<br><br>             Plaintiffs,<br><br>   v.<br><br>DEPARTMENT OF STATE,<br><br>          Defendant. | No. 1:11-CV-01072 (CKK) |

---

### PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiffs American Civil Liberties Union and American Civil Liberties Union Foundation hereby oppose Defendant Department of State's motion for summary judgment and cross-move for summary judgment pursuant to Federal Rule of Civil Procedure 56(a).

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
Tel: (202) 457-0800
Fax: (202) 452-1868
artspitzer@gmail.com


 /s/ Ben Wizner
_____
Ben Wizner
Nathan Freed Wessler
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
Fax: (212) 549-2654
bwizner@aclu.org
nwessler@aclu.org

*Counsel for Plaintiffs*

January 23, 2012

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION and AMERICAN CIVIL LIBERTIES UNION FOUNDATION, <br><br>         Plaintiffs, <br><br>    v. <br><br> DEPARTMENT OF STATE, <br><br>         Defendant. | No. 1:11-CV-01072 (CKK) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT**

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
 of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
Tel: (202) 457-0800
Fax: (202) 452-1868
artspitzer@gmail.com

Ben Wizner
Nathan Freed Wessler
American Civil Liberties Union
 Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
Fax: (212) 549-2654
bwizner@aclu.org
nwessler@aclu.org

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 3

    I.    Procedural History .................................................................................3

    II.    Records Requested .................................................................................4

STANDARD OF REVIEW ................................................................................................ 6

ARGUMENT .................................................................................................................... 8

    I.    Withholding Pursuant to Exemption 1 is Not Justified Because the
Government Has Failed to Demonstrate that Harm Would Result
from Release of the Requested Records ...............................................8

        A.    The Walter Declaration Fails to Address Relevant Harms and
Therefore is Not Entitled to Deference .....................................8

        B.    No Harm Would Result from Release of the Requested Records
Because they are Already Available In Full in the Public
Domain and the State Department has Confirmed their
Authenticity .............................................................................13

        C.    This Court Should Review the Withheld Records In Camera ..............20

        D.    The Government has Waived its Ability to Withhold the
Requested Records by Officially Confirming their Authenticity ..........22

    II.    The Government's Exemptions 6 and 7 Claims Must Fail ...............................25

        A.    The Government's Invocation of Exemptions 6 and 7(C) Fails
Because the Records are Already in the Public Domain and the
Balance of Interests Tips Toward Disclosure ..........................................25

        B.    The Government's Invocation of Exemptions 7(A) and 7(D)
Fails Because the Prior Public Release of the Requested Records
Vitiates the Government's  Arguments .....................................34

    III.    The Court Should Grant Plaintiffs' Cross-Motion for Summary
Judgment for the Same Reasons It Should Deny Defendant's Motion ...........36

CONCLUSION ............................................................................................................. 36

# TABLE OF AUTHORITIES

## Cases

*Afshar v. Dep't of State*, 702 F.2d 1125 (D.C. Cir. 1983) ............................................. 19

*Allen v. CIA*, 636 F.2d 1287 (D.C. Cir. 1980) ................................................................ 7

*Am. Civil Liberties Union v. Dep't of Def.*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005) ...................... 32

*Am. Civil Liberties Union v. Dep't of Justice*, __ F. Supp. 2d __, 2011 WL 4005324
   (D.D.C. Sept. 9, 2011) .................................................................................. 20

*Am. Civil Liberties Union v. U.S. Dep't of Justice*, 655 F.3d 1 (D.C. Cir. 2011)............. 27, 28, 29

*Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274 (2d Cir. 2009)................................... 32

*Bartholdi Cable Co., Inc. v. Fed. Commc'ns Comm'n*, 114 F.3d 274 (D.C. Cir. 1997) .............. 29

*Bast v. Dep't of Justice*, 665 F.2d 1251 (D.C. Cir. 1981)................................................. 28

*Bibles v. Oregon Natural Desert Ass'n*, 519 U.S. 355 (1997) ...................................... 26

*Blanton v. Dep't of Justice*, 64 F. App'x 787 (D.C. Cir. 2003) .................................... 27

*Campbell v. Dep't of Justice*, 164 F.3d 20 (D.C. Cir. 1998) .................................... 8, 12

*Ctr. for Auto Safety v. Envtl. Prot. Agency*, 731 F.2d 16 (D.C. Cir. 1984)..................... 21

*Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918 (D.C. Cir. 2003).............. 26, 34

*Davis v. U.S. Dep't of Justice*, 968 F.2d 1276 (D.C. Cir. 1992)..................................... 27

*Edmonds v. Fed. Bureau of Investigation*, 272 F. Supp. 2d 35 (D.D.C. 2003) ............................ 28

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990) ....................................................... 23

*Hall v. CIA*, 668 F. Supp. 2d 172 (D.D.C. 2009).......................................................... 13

*Halpern v. Fed. Bureau of Investigation*, 181 F.3d 279 (2d Cir. 1999) ............................ 12

*In re Guantanamo Bay Detainee Litig.*, 624 F. Supp. 2d 27 (D.D.C. 2009) .......................... 32

*Int'l Counsel Bureau v. U.S. Dep't of Def.*, 723 F. Supp. 2d 54 (D.D.C. 2010).............. 13, 25, 32

*James Madison Project v. CIA*, 607 F. Supp. 2d 109 (D.D.C. 2009)......................... 8, 9

*Jefferson v. Dep't of Justice*, 284 F.3d 172 (D.C. Cir. 2002) ..................................... 26

*Kimberlin v. Dep't of Justice*, 139 F.3d 944 (D.C. Cir. 1998)................................................. 27, 28

*King v. U.S. Dep't of Justice*, 830 F.2d 210 (D.C. Cir. 1987) ............................................... 7, 9, 10

*Lamont v. Dep't of Justice*, 475 F. Supp. 761 (S.D.N.Y. 1979) ..................................................... 14

*Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009)............................................................... 7, 8

*Lurie v. Dep't of Army*, 970 F. Supp. 19 (D.D.C. 1997)................................................................. 32

*Maydak v. U.S. Dep't of Justice*, 218 F.3d 760 (D.C. Cir. 2000) ................................................... 31

*Meeropol v. Meese*, 790 F.2d 942 (D.C. Cir. 1986) ....................................................................... 22

*Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981)................................................... 11

*Miller v. Casey*, 730 F.2d 773 (D.C. Cir. 1984) .............................................................................. 7

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) ............................................................................. 26

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002)............................. 7, 25, 26

*Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) ........................... 7

*Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995)...................................... 27

*Paracha v. Obama*, No. 04-cv-2022 (PLF) (D.D.C. June 15, 2011)............................................. 17

*Pub. Citizen v. Dep't of State,* 11 F.3d 198 (D.C. Cir. 1993) ....................................................... 23

*Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810 (D.C. Cir. 2008) ..................................... 7

*Quinon v. Fed. Bureau of Investigation*, 86 F.3d 1222 (D.C. Cir. 1996) ..................................... 22

*Ray v. Turner*, 587 F.2d 1187 (D.C. Cir. 1978)....................................................................... 21, 22

*Reed v. Nat'l Labor Relations Bd.*, 927 F.2d 1249 (D.C. Cir. 1991)........................................... 29

*Scott v. CIA*, 916 F. Supp. 42 (D.D.C. 1996).............................................................................. 12

*Spirko v. U.S. Postal Serv.*, 147 F.3d 992 (D.C. Cir. 1998) .................................................... 21, 22

*Stern v. Fed. Bureau of Investigation*, 737 F.2d 84 (D.C. Cir. 1984)........................................... 32

*U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749 (1989) . 27, 28, 29

*U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989) ......................................................... 7

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) ........................................................................ 31

*Wash. Post v. Dep't of Def., 766 F. Supp. 1 (D.D.C. 1991) ................................................. passim

Williams v. Fed. Bureau of Investigation, 69 F.3d 1155 (D.C. Cir. 1995) ................................... 34

Wilson v. CIA, 586 F.3d 171 (2d Cir. 2009) ............................................................................... 19

*Wolf v. CIA, 473 F.3d 370 (D.C. Cir. 2007) ................................................................ 20, 23, 24

**Statutes**

*5 U.S.C. § 552 .............................................................................................................. passim

**Other Authorities**

*Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) ................................................. passim

**INTRODUCTION**

This litigation under the Freedom of Information Act ("FOIA") requires the Court to determine whether Defendant Department of State ("State Department" or "DOS") may continue to withhold from release records that already reside in the public domain and whose prior public release State Department officials have repeatedly acknowledged.  The prior publication of the records requested by Plaintiffs is the central fact in this case.  Nevertheless, the State Department's declaration in support of summary judgment fails to mention it even once.  This renders the declaration unworthy of deference and the government's legal arguments almost wholly irrelevant to the issues before the Court.

In 2010, an organization called Wikileaks provided to several newspapers and then began publishing online a cache of approximately 250,000 U.S. government embassy cables, allegedly provided to the organization by a Department of Defense employee.  The State Department decried the unauthorized dissemination of these cables and repeatedly confirmed their authenticity.  Plaintiffs' FOIA request seeks 23 of the cables previously published by Wikileaks. The cables concern the United States' diplomatic response to foreign investigations of United States abduction, interrogation, detention, and rendition practices; the U.S. government's use of unmanned aerial vehicles; and the diplomatic response to President Obama's decision to oppose the release of photographs depicting U.S. interrogations of persons suspected of terrorism.  In response to Plaintiffs' request, the State Department released 11 cables in part and withheld 12 cables in full.  The government's response again confirms that the requested cables are actual government documents by describing their existence, origin, and identifying details, and by releasing portions of 11 cables that are identical to the contents of the cables released by Wikileaks.

The State Department seeks to withhold records pursuant to Exemption 1 of FOIA, which exempts from disclosure information that is "properly classified" pursuant to the governing executive order.  5 U.S.C. § 552(b)(1).  The executive order states that information may be classified only if its release "reasonably could be expected to result in damage to the national security."  Exec. Order No. 13,526, § 1.1(a)(4), 75 Fed. Reg. 707 (Dec. 29, 2009).  The government's entire case on summary judgment relies on the fiction that the requested records are not already in the public domain, and describes the harms that would have resulted from release of the cables had they never been published by Wikileaks.  Plaintiffs do not dispute that at least some of those harms might be relevant to a request for records not already disseminated to the public, but they are completely irrelevant here.  The government's burden in *this* case is to demonstrate that release of the requested records *now*, after the records have already been made public and after the government has confirmed their authenticity, would result in damage to the national security.

The State Department's declaration is silent on this point for the simple reason it cannot plausibly point to relevant harms; any harm to foreign relations or national security already occurred months ago, upon initial release of the cables, and will not be renewed upon subsequent release of the exact same documents.  The State Department's willful failure to engage with this fact renders its declaration insufficient, and the Court thereby owes it no deference.  The government cannot sustain its Exemption 1 claim by ignoring an inconvenient truth:  The cables are already public, and Exemption 1 cannot shield them from release.

The government also seeks to withhold information pursuant to FOIA Exemptions 6 and 7, which protect the personal privacy of individuals named in government documents and shelter from release certain types of law enforcement records.  The acknowledged prior public release of

the requested records defeats these claims as well, by vitiating any privacy interests or other

protectable interests in the records.  Moreover, by refusing to take into account that the records

are already in the public domain, the government has provided a roadmap of the specific

information in the records that it considers most sensitive, including the names of confidential

informants and people subject to criminal investigation.  The government cannot protect this

information from public release because it is already public, and its obfuscatory and illogical

response to Plaintiffs' request produces far more harm in highlighting this information than does

Plaintiffs' request itself.

    In short, the government has failed to support its withholding claims because they are

unsupportable.  This Court should order the government to release the balance of the requested

records in full.

## BACKGROUND

### I.    Procedural History

    On April 12, 2011, the American Civil Liberties Union and American Civil Liberties

Union Foundation (collectively, "Plaintiffs") filed a FOIA request with the Department of State

seeking 23 specifically identified embassy cables.  Decl. of Nathan Freed Wessler ("Wessler

Decl.") Ex. A (FOIA Request).  Plaintiffs identified each requested cable by originating

embassy, date, unique Message Reference Number, and subject.[1]

    After DOS denied Plaintiffs' request for expedited processing initially and on

administrative appeal, *see* Wessler Decl. Exs. B, D (letters dated April 28, 2011 and May 23,

---

[1] For example, the first cable requested was described as follows:  "The embassy cable bearing the ID '07MADRID1805,' originating in the Madrid Embassy on September 18, 2007, with the subject 'SPAIN STILL INTERESTED IN GUANTANAMO DETAINEES, BUT NOT OPTIMISTIC ABOUT CONVICTION.'" Wessler Decl. Ex. A, at 2.

2011), Plaintiffs commenced this action on June 9, 2011. Compl., ECF. No. 1. The State Department thereafter conducted a search and processed records responsive to Plaintiffs' request according to a stipulated schedule and unopposed extension. *See* Joint Status Report, ECF No. 11; Def.'s Unopposed Mot. to Extend Produc. Deadline, ECF No. 12. On October 21, 2011, the government informed Plaintiffs that it had identified 23 documents responsive to the request. *See* Wessler Decl. Ex. E. As made clear by the Declaration of Sheryl L. Walter ("Walter Decl."), the 23 records identified by the government correspond with the 23 cables requested by Plaintiffs. *Compare* Walter Decl., ECF No. 17-2 ¶¶ 36–40, 44–45, 48–49, 52–53, 56–58, 61–63, 66–67, 71–73, 75, *with* Wessler Decl. Ex. A, at 2–4 (FOIA Request). DOS released partially redacted versions of 11 cables, and withheld 12 cables in full. On December 22, 2011, DOS re-released two cables with small amounts of additional material unredacted. *See* Wessler Decl. Exs. Q–S.

## II.  Records Requested

On November 28, 2010, five newspapers—the *New York Times*, the *Guardian*, *Le Monde*, *El Pais*, and *Der Spiegel*—began publishing a series of articles based on a large cache of documents provided to them by Wikileaks. *See* David Leigh, *How 250,000 US Embassy Cables Were Leaked*, Guardian, Nov. 28, 2010, http://bit.ly/iczU87. The documents were identified as diplomatic cables—written communications between U.S. embassies, State Department headquarters, and other DOS offices—and were allegedly obtained from the State Department. Among the cables released by Wikileaks and discussed in the press were the 23 cables requested by Plaintiffs. These cables concern the United States' diplomatic response to foreign investigations of United States abduction, interrogation, detention, and rendition practices; the federal government's use of unmanned aerial vehicles; and the diplomatic response to President

4

Obama's decision to oppose the release of photographs depicting U.S. interrogations of persons suspected of terrorism.  Each of the requested cables has been available to the public via the internet for months.  *See* Wessler Decl. ¶¶ 4–9 (describing Wikileaks and release of cables).  Copies of the 23 cables as released by Wikileaks are attached to the Wessler Declaration.  *Id.* Exs. T–AS.

In the State Department's declaration supporting its motion for summary judgment, the government has explicitly acknowledged that each of the 23 requested cables is an actual government document.  *See* Walter Decl. ¶¶ 35–76.  The State Department does not take the position that the cables released by Wikileaks are inauthentic; nor does it invoke a "Glomar" response to assert that any confirmation or denial of the cables' authenticity would harm national security.  Rather, the Walter Declaration confirms the origin, date, length, and contents of each cable, making clear that the cables published by Wikileaks are authentic.  *See id.*  The text of the 11 cables released in part by the State Department also confirms that the cables published by Wikileaks and the cables identified by the government in this litigation are identical.  *Compare* Wessler Decl. Exs. F–P, R–S (cables released in part by DOS), *with id.* Exs. T–W, AB–AC, AI, AK–AM, AR (full text of same cables).

Further, since the initial release of the approximately 250,000 State Department cables, State Department officials, including Secretary of State Hillary Rodham Clinton, have repeatedly acknowledged the release of the cables by Wikileaks and the press.  *See, e.g.*, Hillary Rodham Clinton, Sec'y of State, Remarks to the Press on Release of Purportedly Confidential Documents by Wikileaks, (Nov. 29, 2010), http://www.state.gov/secretary/rm/2010/11/152078.htm ("[T]he United States deeply regrets the disclosure of any information that was intended to be confidential . . . ."); *id.* ("[W]e are taking aggressive steps to hold responsible those who stole

this information."); Hillary Rodham Clinton, Sec'y of State, Town Hall on Empowering Civil

Society for Central Asia's Future (Nov. 30, 2010),

http://www.state.gov/secretary/rm/2010/11/152169.htm ("[W]e consider it regrettable that the

information that was meant to be confidential has been made public."); Secretary Philip J.

Crowley, Assistant Sec'y, Press Briefing (Dec. 1, 2010),

http://www.state.gov/r/pa/prs/dpb/2010/12/152235.htm ("[S]omebody inside the United States

Government who has authorized access to this material, downloaded it and passed it to someone

who is not authorized to have it. That is a crime and we are investigating that crime and we'll

hold the people responsible fully accountable."); Remarks by Secretary of State Clinton on

Internet Freedom (Feb. 15, 2011),

http://translations.state.gov/st/english/texttrans/2011/02/20110215155718su0.3556896.html

("Fundamentally, the WikiLeaks incident began with an act of theft.  Government documents

were stolen . . . .").  Moreover, on March 1, 2011, the Department of Defense brought criminal

charges against Private First Class Bradley E. Manning under the Uniform Code of Military

Justice, alleging that he did "steal, purloin, or knowingly convert to his use or the use of another,

a record or thing of value of the United States or of a department or agency thereof, to wit: the

Department of State Net-Centric Diplomacy database containing more than 250,000 records

belonging to the United States government . . . ."  Charge Sheet (Mar. 1, 2011) at 4, *available at*

http://www.wired.com/images_blogs/threatlevel/2011/03/PFC-Manning_Additional-Charge-

Sheet_REDACTED_02MAR11.pdf.

## STANDARD OF REVIEW

Congress enacted FOIA to "ensure an informed citizenry, vital to the functioning of a

democratic society, needed to check against corruption and to hold the governors accountable to

the governed." *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). "Although Congress enumerated nine exemptions from the disclosure requirement, 'these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.'" *Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 813 (D.C. Cir. 2008) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)) (internal quotation marks omitted). "Accordingly, FOIA's exemptions are to be narrowly construed." *Id.* "The burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records' or have not been 'improperly' 'withheld.'" *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989). Accordingly, a FOIA plaintiff is entitled to summary judgment under Federal Rule of Civil Procedure 56 where the agency fails to justify its withholdings. *Id.* at 142; 5 U.S.C. § 552(a)(4)(B).

In supporting its withholding decisions, the agency must provide affidavits that "'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)). "The significance of agency affidavits in a FOIA case cannot be underestimated." *King v. U.S. Dep't of Justice*, 830 F.2d 210, 218 (D.C. Cir. 1987). "[C]onclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the government's burden." *Larson*, 565 F.3d at 864. "To accept an inadequately supported exemption claim 'would constitute an abandonment of the trial court's obligation under the FOIA to conduct a *de novo* review." *King*, 830 F.2d at 219 (quoting *Allen v. CIA*, 636 F.2d 1287, 1293 (D.C. Cir. 1980)).

**ARGUMENT**

I.     **Withholding Pursuant to Exemption 1 is Not Justified Because the Government Has Failed to Demonstrate that Harm Would Result from Release of the Requested Records**

     A.     **The Walter Declaration Fails to Address Relevant Harms and Therefore is Not Entitled to Deference**

The government cannot prevail on summary judgment on its Exemption 1 claim because its declaration wholly fails to provide a "reasonably specific" explanation of how release of the requested records would cause harm to the national security and is controverted by contrary evidence in the record. *See Larson*, 565 F.3d at 862. Although agency declarations in national security-related Exemption 1 cases typically "merit substantial weight,"

> deference is not equivalent to acquiescence; the declaration may justify summary judgment only if it is sufficient to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding. Among the reasons that a declaration might be insufficient are lack of detail and specificity, bad faith, and failure to account for contrary record evidence.

*Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998) (internal quotation marks and citations omitted). "If the court finds that the agency's affidavits are insufficiently detailed, it should deny summary judgment in Exemption 1 cases on procedural grounds." *James Madison Project v. CIA*, 607 F. Supp. 2d 109, 121 (D.D.C. 2009) (citing *Campbell*, 164 F.3d at 31).

Exemption 1 allows withholding of matters that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Executive Order 13,526 governs classification of national security information and provides that information may be classified only if four conditions are met:

(1) an original classification authority is classifying the information;

8

(2) the information is owned by, produced by or for, or is under the control of the United States Government;

(3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security . . . and the original classification authority is able to identify or describe the damage.

Exec. Order No. 13,526, § 1.1(a), 75 Fed. Reg. 707 (Dec. 29, 2009). "Damage to the national security" is defined as "harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information." *Id.* at § 6.1(*l*). In order to meet its burden on summary judgment, the agency must provide a detailed explanation of how each of the requirements of section 1.1 of the Executive Order is satisfied. *See King*, 830 F.2d at 221–24 & n.91. As to the fourth requirement, the agency must "describe with reasonable specificity the material withheld and demonstrate that it has specifically tailored its description of the harm likely to result from release to each particular redaction." *James Madison Project*, 607 F. Supp. 2d at 122 (citing *King*, 830 F.2d at 223–24); *see also King*, 830 F.2d at 224 ("To support its Exemption 1 claims, the agency affidavits must, for each redacted document or portion thereof, . . . explain how disclosure of the material in question would cause the requisite degree of harm to the national security."). The government has failed to satisfy that burden here.

Each record requested by Plaintiffs is already in the public domain, in its entirety. *See* Wessler Decl. ¶¶ 8–9 & Exs. T–AS. As explained in detail below, the fact that information subject to the instant request already resides in the public domain *and* has been acknowledged as authentic by the State Department's response to this litigation is highly relevant—indeed, wholly

dispositive—to the question whether official release of that information "reasonably could be expected to result in damage to the national security." *See Wash. Post v. Dep't of Def.*, 766 F. Supp. 1, 9–10 (D.D.C. 1991) ("It is a matter of common sense that the presence of information in the public domain makes the disclosure of that information less likely to 'cause damage to the national security.'"). Yet the Walter Declaration inexplicably fails to address whether release of the cables would harm national security *in light of the fact that the cables are already widely available to the public and have been acknowledged to be authentic*. The Declaration explains the harm that could have resulted from release of the cables in an alternate universe in which the cables had not already been placed in the public domain. But those "harms" are irrelevant to the government's burden here: to "discuss the consequences of disclosing the sought-after information" under the facts of *this* case. *King*, 830 F.2d at 223–24.

The Walter Declaration is willfully blind to the single most salient fact about the requested records: that the government has officially acknowledged that the public copies are authentic. Although the Declaration avers that "to the best of my knowledge, no authorized Executive Branch official has disclosed the withheld information into the public domain," Walter Decl. ¶ 10, it does not once mention Wikileaks, the public availability of the requested records, or the government's confirmation of their authenticity—even as the Declaration simultaneously provides just such a confirmation. The Defendant cannot properly ignore these facts, embarrassing and inconvenient though it may find them. In order to justify withholding of the requested records, the government must address whether any *additional* harms would flow from official release of the cables now, not merely whether harm would have occurred prior to their public dissemination and acknowledgment. The declaration therefore lacks "reasonably specific detail" by completely omitting discussion of these crucial facts, *see Military Audit Project v.*

*Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981), and is "controverted by . . . contrary evidence in the record"—the copies of the cables as released by Wikileaks (attached to the Wessler Declaration) and citations to the newspaper articles describing and discussing the cables (provided in the following subsection), *see id.  See also* Wessler Decl. Exs. T–AS.  The Walter Declaration is not entitled to deference and the government's motion for summary judgment must be denied.

This Court reached precisely this conclusion in *Washington Post v. Department of Defense*, 766 F. Supp. 1 (D.D.C. 1991).  That case concerned a FOIA request for records relating to the government's failed attempt in 1980 to rescue American hostages from the United States embassy in Teheran.  The plaintiff identified and submitted to the court numerous materials in the public domain that allegedly matched information being withheld by the government.  The government took the position that information in the public domain was irrelevant to the Exemption 1 analysis unless that information had been officially disclosed by the government, and did not address in its declarations whether official release of the requested records would harm the national security in light of the information in the public domain identified by the plaintiff.  The court found fault with the government's failure to address the prior public disclosures, holding that "information already in the public domain . . . . might constitute the sort of 'contrary evidence' controverting an agency's determination that according to our Court of Appeals prompts a more searching review of the agency's justification under Exemption 1." *Wash. Post*, 766 F. Supp. at 9.  The court stated that "this Court never held that the presence of information in the public domain could be ignored by an agency when considering whether an official release of such information would harm the national security," *id.* at 10, and explained that

> [t]he presence of such information is . . . relevant to the determination, required
> by [the Executive Order], that disclosure of the information in question

> "reasonably could be expected to cause damage to the national security."  By
> providing evidence that the information being withheld is already within the
> public domain, a FOIA plaintiff brings into question the government's
> determination that release of such information might reasonably be expected to
> damage the national security.  Such contrary evidence, in turn, requires the Court
> to investigate the agency's declarations more closely and determine whether the
> agency has answered the questions raised by the plaintiff's evidence.

*Id.* at 12 (citation omitted).  The court concluded that the government's "concern over the

damage that disclosure of a particular agency's involvement might well be misplaced if such

damage has already been done [by previous release of the information].  A more particularized

explanation, taking into account the presence of such information in the public realm, is

necessary in order to justify continued withholding of that information."  *Id.* at 13.  The court

denied the government's motion for summary judgment and ordered it to produce new public

declarations addressing whether the publicly available materials changed the assessment of harm.

*Id.* at 18; *see also Scott v. CIA*, 916 F. Supp. 42, 50 (D.D.C. 1996) (requiring the government to

release information already in the public domain "or provide 'a specific explanation for

continued withholding of that information, supported by appropriate agency declarations, of why

formal release of information already in the public domain threatens the national security'"

(quoting *Wash. Post*, 766 F. Supp. at 10)).

     The Walter Declaration fails to pay even cursory attention to whether national security

would be *additionally* harmed by release of records that were initially made available to the

public months ago, and therefore have already caused whatever damage could be expected to

result from their disclosure.  Because the Declaration omits explanation of a key issue, it is not

entitled to deference from the Court.  *See Campbell*, 164 F.3d at 30; *Halpern v. Fed. Bureau of

Investigation*, 181 F.3d 279, 295 (2d Cir. 1999) ("[T]he good faith presumption that attaches to

agency affidavits only applies when accompanied by reasonably detailed explanations of why

material was withheld.  Absent a sufficiently specific explanation from an agency, a court's *de novo* review is not possible and the adversary process envisioned in FOIA litigation cannot function.").  Moreover, the Walter Declaration's discussion of harm to the national security, premised on the fiction that the requested records are not public, is controverted by contrary record evidence of the existence of the records in the public domain.  *See Wash. Post*, 766 F. Supp. at 9.  The Walter Declaration fails to meet the government's burden, and the government's motion for summary judgment must be denied.[2]

**B.      No Harm Would Result from Release of the Requested Records Because they are Already Available In Full in the Public Domain and the State Department has Confirmed their Authenticity**

All 23 of the records requested by Plaintiffs are already in the public domain, and are available to any person with access to the internet.  They have been quoted extensively in the press, and their authenticity has been confirmed by the State Department.  Therefore, because any harm that might flow from official release of the records has already occurred, their continued classification is unjustified and they may not be withheld under Exemption 1.

Exemption 1 of FOIA allows withholding of records only if they are "properly classified" pursuant to the governing executive order.  5 U.S.C. § 552(b)(1)(B).  As discussed above, Executive Order 13,526 permits classification only if disclosure of "the information reasonably could be expected to result in damage to the national security."  Exec. Order No. 13,526, §

---

[2] This Court has not hesitated to reject agency declarations that fail to address other key factual and legal issues in FOIA cases.  *See, e.g.*, *Int'l Counsel Bureau v. U.S. Dep't of Def.*, 723 F. Supp. 2d 54, 64 (D.D.C. 2010) ("The D.C. Circuit has made clear that a categorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate to support withholding records, even under exemption 1." (internal quotation marks omitted)); *Hall v. CIA*, 668 F. Supp. 2d 172, 188 (D.D.C. 2009) (rejecting as "plainly incorrect" the agency's assertion in its declaration that all of the "records withheld pursuant to exemption 1 are less than twenty-five years old," and ordering the agency to correct its omission and address in a supplemental filing why the older documents can properly be withheld).

1.1(a)(4).  Plaintiffs do not dispute that there might be circumstances where release of embassy cables not otherwise available to the public could cause cognizable harms to the national security.  But that is not the situation presented here, where the full text of each requested cable is already in the public domain.

> This Court has recognized that
>
> It is a matter of common sense that the presence of information in the public domain makes the disclosure of that information less likely to "cause damage to the national security."  The Executive Order itself recognizes this fact:  Under § [1.7(c)], previously declassified and disclosed information may be reclassified only "if it is determined in writing that . . . the information may reasonably be recovered."  In other words, if the information has already been disclosed and is so widely disseminated that it cannot be made secret again, its subsequent disclosure will cause no *further* damage to the national security.  As a consequence, according to our Court of Appeals, suppression of "already well publicized" information would normally "frustrate the pressing policies of the Act without even arguably advancing countervailing considerations."

*Wash. Post*, 766 F. Supp. at 9 (citation omitted); *see also Lamont v. Dep't of Justice*, 475 F. Supp. 761, 772 (S.D.N.Y. 1979) (stating that if the subject of the plaintiff's FOIA request has "already been specifically revealed to the public . . . . , there is no reason such material cannot now be disclosed to [the plaintiff]. The 'sunshine' purposes of the FOIA would be thwarted if information remained classified after it became part of the public domain.").  Thus, once materials have entered the public domain, their continued classification and withholding is appropriate only if their official release would cause *additional* harm, beyond any harm that already occurred upon their initial public dissemination.  The government cannot maintain information as classified based on harms that have already occurred.  *See* Exec. Order No. 13,526, § 1.1(a)(4).

The contents of the cables requested by Plaintiffs have been available to the public on the Wikileaks website for months, with some released as early as 2010.  *See* Wessler Decl. ¶¶ 8–9.

The large cache of embassy cables that were disclosed to the public by Wikileaks generated

extraordinary and sustained media attention and worldwide public interest.[3]  The particular

cables subject to Plaintiffs' Request have also generated significant media coverage, with many

newspaper stories both quoting from and providing links to the full text of the cables.  For

example, Cable 07Berlin242 (identified by DOS as Document E9), which described the United

States' negotiations with German officials regarding the rendition of German citizen Khaled El-

Masri, was widely quoted in press reports.[4]  So was Cable 10Rome174 (Document E28), which

described the United States' attempts to influence Italian judicial proceedings concerning the

---

[3] *See, e.g.*, Scott Shane & Andrew W. Lehren, *Leaked Cables Offer Raw Look at U.S. Diplomacy*, N.Y. Times, Nov. 28, 2010, http://nyti.ms/go4HPQ; Matthew Lee, *Leaked US Cables Reveal Sensitive Diplomacy*, Associated Press, Nov. 28, 2010, http://bo.st/hbcUYu; David Leigh, *How 250,000 US Embassy Cables Were Leaked*, Guardian, Nov. 28, 2010, http://bit.ly/iczU87; Dina Temple-Raston, *WikiLeaks Release Reveals Messier Side Of Diplomacy*, Nat'l Pub. Radio, Nov. 28, 2010, http://n.pr/hraH2o; *Leaked Cables Reveal True US Worldview*, Der Spiegel, Nov. 28, 2010, http://bit.ly/hbXqIw; Mark Landler & J. David Goodman, *Clinton Says U.S. Diplomacy Will Survive 'Attack'*, N.Y. Times, Nov. 29, 2010, http://nyti.ms/ezs031; Korva Coleman, *WikiLeaks' Latest Dump Reveals Embarrassing Side of Diplomacy*, Nat'l Pub. Radio, Nov. 29, 2010, http://n.pr/f94FxF; Jay Solomon, Adam Entous & Julian E. Barnes, *Vast Leak Discloses Diplomatic Secrets*, Wall St. J., Nov. 29, 2010, http://on.wsj.com/i9ydBR; Editorial, Marc A. Thiessen, *Obama Administration is Weak in the Face of WikiLeaks*, Wash. Post, Nov. 29, 2010, http://wapo.st/gXzt2P; Evan Perez & Jeanne Whalen, *'Crimes Were Committed' in Document Leak, U.S. Says*, Wall St. J., Nov. 29, 2010, http://on.wsj.com/eYpleW; *How America Views the World*, Der Spiegel, Nov. 29, 2010, http://bit.ly/hqmVH7; Michele Kelemen, *Learning What Officials Really Think, Via WikiLeaks*, Nat'l Pub. Radio, Nov. 30, 2010, http://n.pr/gX0Gfu; Alisair MacDonald, *U.K. Officials Brace For New WikiLeaks Revelations*, Wall St. J., Dec. 1, 2010, http://on.wsj.com/gMuB9x.

[4] *See, e.g.*, Michael Slackman, *Officials Pressed Germans on Kidnapping by C.I.A.*, N.Y. Times, Dec. 8, 2010, http://nyti.ms/e8mrvh; Editorial, Jeff Stein, *Leaked Cable: U.S. Warned Germany Against Arrests in Masri Case*, Wash. Post, Nov. 29, 2010, http://wapo.st/gNVYzs; Nick Baumann, *Wikileaks, Rendition, and the CIA's Italian Job*, Mother Jones, Dec. 13, 2010, http://bit.ly/he5P3R; Bob Egelko, *WikiLeaks Cables Recount How U.S. Pressured Allies*, S.F. Chron., Mar. 6, 2011, http://bit.ly/gG3yDm; Letta Tayler, *Time To Clean House On Torture*, Guardian, Dec. 3, 2010, http://bit.ly/h52Ynd.

rendition of Abu Omar from Milan,[5] and Cables 09Madrid347 (Document E21), 09Madrid392

(Document E22), and 09Madrid440 (Document E23), which detail United States attempts to

influence a Spanish investigation of U.S. officials' involvement in the rendition and torture of

suspected terrorists.[6]   Likewise, Cable 10Sanaa4 (Document E26), discussing United States'

diplomatic actions regarding the use of unmanned aerial vehicles in Yemen,[7] and Cable

08London2651 (Document E19), describing United States and British officials' discussions

about relations with Pakistan.[8]   Cable 05Paris1699 (Document E1), regarding French

investigation and prosecution of former Guantanamo detainees, has also been cited in the press,

as well as introduced as evidence in a French court.[9]

Further, the State Department's response to *this* litigation has provided explicit

confirmation that each of the 23 cables at issue is an authentic government document.   The

---

[5] *See, e.g.*, Nick Baumann, *Wikileaks, Rendition, and the CIA's Italian Job*, Mother Jones, Dec. 13, 2010, http://bit.ly/he5P3R; John Goetz & Matthias Gebauer, *US Pressured Italy to Influence Judiciary*, Der Spiegel, Dec. 17, 2010, http://bit.ly/g5IULo.

[6] *See, e.g.*, Carol Rosenberg, *WikiLeaks: How U.S. Tried to Stop Spain's Torture Probe*, Miami Herald, Dec. 28, 2010, http://bit.ly/g6jdax; Giles Tremlett, *Wikileaks: US Pressured Spain Over CIA Rendition and Guantanamo Torture*, Guardian, Dec. 1, 2010, http://bit.ly/dHFVAP; Carlos Yarnoz, *US Embassy Conspired to Derail Cases in Spain's High Court*, El Pais, Nov. 30, 2011, http://bit.ly/fri6eG; Bob Egelko, *WikiLeaks Cables Recount How U.S. Pressured Allies*, S.F. Chron., Mar. 6, 2011, http://bit.ly/gG3yDm; Letta Tayler, *Time To Clean House On Torture*, Guardian, Dec. 3, 2010, http://bit.ly/h52Ynd; *WikiLeaks Cables Reveal U.S. Tried to Thwart Spanish Probes of Gitmo Torture and CIA Rendition,* DemocracyNow!, Dec. 1, 2010, http://bit.ly/fJJaR7.

[7] *See, e.g.*, Nick Allen, *WikiLeaks: Yemen Covered Up US Drone Strikes*, The Telegraph, Nov. 28, 2010, http://bit.ly/htZzo5; Juliane von Mittelstaedt, *A US Hand in Yemen's Civil War*, Der Spiegel, Dec. 3, 2010, http://bit.ly/g1uVLq; Scott Shane, *Yemen Sets Terms of a War on Al Qaeda*, N.Y. Times, Dec. 3, 2010, http://nyti.ms/fnp9GR.

[8] *See, e.g.*, Hedi Blake, *WikiLeaks Cables: Zardari is a Numbskull, British Told Americans*, Telegraph, Feb. 5, 2011, http://bit.ly/gEVUAL; Jonathan Steele, *WikiLeaks Cables: Pakistan's Zardari is a 'Numbskull'*, Guardian, Nov. 30, 2010, http://bit.ly/i2vzt6.

[9] *See* Pierre-Antoine Souchard, *WikiLeaks Cited in French Guantanamo Trial*, Associated Press, Jan. 20, 2011, http://bit.ly/A9VZxk ("Lawyers for ex-inmates of the Guantanamo prison camp used documents released by WikiLeaks to argue for their acquittal in a French terrorism trial Thursday.").

Walter Declaration acknowledges the existence of each cable and provides details about its origin, length, and contents. *See* Walter Decl. ¶¶ 35–76. The government has also released in part 11 of the requested cables, providing confirmation that the contents of the cables in the government's possession are identical to the contents of the cables available to the public. *Compare* Wessler Decl. Exs. F–P, R–S (eleven cables released in part by State Department), *with id.* Exs. T–W, AB–AC, AI, AK–AM, AR (contents of same cables made publicly available by Wikileaks). The State Department has *not* taken the position that the cables released by Wikileaks and disseminated in the press are forgeries or frauds, or contain alterations to the original, authentic text; nor has it invoked a "Glomar" defense to assert that any confirmation or denial of the cables' authenticity would harm national security.[10] Rather, it has now confirmed in the particular what it had already stated in general[11]: the cables at issue, which are already fully available to the public in their entirety, are official government records.

---

[10] In a brief filed on June 15, 2011, in the Guantanamo habeas case *Paracha v. Obama*, the government stated that it "has not confirmed or denied that any individual reports released by WikiLeaks are official government documents." Respondent's Response to Petitioner's Emergency Application for Immediate Access to All Publicly Available Wikileaks Documents Relevant to Petitioner's Case at 2, *Paracha v. Obama*, No. 04-cv-2022 (PLF) (D.D.C. June 15, 2011), ECF No. 376. In *Paracha*, the habeas petitioner's counsel filed a motion to permit him to use, disseminate, and publicly discuss "detainee assessments" that had been published by Wikileaks but that the government considered classified. Because counsel held a security clearance, the government claimed the right to restrict his use of the assessments. The government took the position that "[a]lthough the Government has confirmed that purported detainee assessments were leaked to WikiLeaks, the Government has neither confirmed nor denied that any particular individual report appearing on the WikiLeaks website is an official government document." *Id.* at 3. The government also claimed that it "must refrain from confirming whether any particular reports disseminated by WikiLeaks are genuine detainee assessments or not, to avoid the risk of even greater harm to national security than may have already been caused by WikiLeaks' disclosures." *Id.* at 4.

The government has not taken this position in the instant litigation. Far from refusing to confirm or deny the authenticity of any particular cable requested by Plaintiffs, it has confirmed the existence and authenticity of each of the 23 requested cables.

[11] As detailed above, even before confirming the authenticity of the particular cables at issue here, State Department officials, including Secretary Clinton, acknowledged generally that

The Walter Declaration identifies several harms that would purportedly result from release of the requested records, including, most prominently, "undermin[ing] bilateral relations" with foreign nations by "degrad[ing] confidence in the U.S. government's ability to maintain information provided in confidence and conduct foreign relations in that context."  Walter Decl. ¶¶ 46, 50, 54, 59, 64, 69, 74, 76; *see also id.* ¶ 41 ("Release of information obtained [from foreign governments] could be expected to damage our relations with particular officials and agencies within these governments and could significantly impact our ability to conduct foreign relations.").  However, any such damage already occurred upon the initial public dissemination of the cables and the extensive media reporting about them.  Any foreign government confidences contained in the cables have already been revealed, and the United States' failure to safeguard more than 250,000 formerly secret embassy cables, including the 23 at issue here, has already degraded whatever belief those governments may have had in the United States' "ability to maintain information provided in confidence."  The media is replete with stories about the dissatisfied responses of foreign governments to the release of the cables, but that dissatisfaction has already occurred.[12]  DOS cannot plausibly attribute to future compliance with Plaintiffs'

_____

the documents obtained and disseminated by Wikileaks were actual State Department embassy cables.  The government is also proceeding with a court martial of Private First Class Bradley E. Manning for providing the State Department cables to Wikileaks.  *See* Scott Shane, *Court Martial Recommended in WikiLeaks Case*, N.Y. Times, Jan. 12, 2012, http://nyti.ms/xZ1BBx ("The military officer who presided over an evidentiary hearing on charges against Pfc. Bradley Manning, accused of leaking hundreds of thousands of confidential government documents to WikiLeaks, recommended on Friday that Private Manning face court martial.").  Any suggestion that the cables disseminated by Wikileaks are not authentic government documents lacks plausibility in light of the above admissions.

[12] *See, e.g.*, Simon Romero, *Ecuador Expels U.S. Ambassador Over WikiLeaks Cable*, N.Y. Times, Apr. 5, 2011, http://nyti.ms/hcuVBp; Mary Beth Sheridan, *U.S. Ambassador to Mexico Resigns After WikiLeaks Revelations*, Wash. Post, Mar. 19, 2011, http://wapo.st/ftoJlB; Ian Traynor, *WikiLeaks Cables Claim First Scalp as German Minister's Aide is Sacked*, Guardian, Dec. 3, 2010, http://bit.ly/gcJhjd; Edward Cody, *Foreign Governments Say WikiLeaks Revelations Undercut Relations With U.S.*, Wash.

FOIA request the harms that have already been caused by its own failure to safeguard confidential records.

The Walter Declaration also asserts that release of Document E18 (Cable 08Ottawa918), a 2008 cable from the U.S. embassy in Ottawa, would cause harm by enabling foreign governments or entities to "identify U.S. intelligence activities, sources or methods and to undertake countermeasures that could frustrate" U.S. government initiatives.  Walter Decl. ¶ 64. But any information about U.S. government intelligence activities contained in this cable is already public, and its release now will provide no additional information to foreign governments and entities, and therefore cannot cause additional harm.  If anything, the Walters Declaration magnifies the alleged harms by calling additional attention to this cable in particular.[13]

The government suggests, in passing, that "even if . . . an unauthorized disclosure did exist," additional harm could result from disclosure pursuant to FOIA because "anything short of [an official] disclosure necessarily preserves some increment of doubt regarding the reliability of the publicly available information."  Mem. in Supp. of Def.'s Mot. for Summ. J., ECF No. 17 ("Gov't Br.") 16 (quoting *Wilson v. CIA*, 586 F.3d 171, 195 (2d Cir. 2009)) (alteration in original).  However, this case differs from cases cited by the government, which concern requests for records containing information that has been "the subject of widespread media and public *speculation*" but not "official acknowledgement."  *Afshar v. Dep't of State*, 702 F.2d 1125, 1130–31 (D.C. Cir. 1983) (emphasis added).  Here, the contents of the requested records

---

Post, Nov. 30, 2010, http://wapo.st/gfAdDW; *The World Reacts to Massive Diplomatic Leak*, Der Spiegel, Nov. 29, 2010, http://bit.ly/e8UQ4D; David Leigh, *US Embassy Cables Leak Sparks Global Diplomatic Crisis*, Guardian, Nov. 28, 2010, http://bit.ly/egv7ky.

[13] Moreover, this cable contains information about *Canadian* intelligence activities, not those of the United States.  *See* Wessler Decl. Ex. AH (full text of cable). Therefore, the Walter Declaration's stated rationale for withholding the cable is poorly matched to the cable's actual contents.

are not the subject of mere speculation in the press; this is not a situation where the press has published reports about the contents of requested records based on not-for-attribution statements of government officials, *see, e.g.*, *Am. Civil Liberties Union v. Dep't of Justice*, __ F. Supp. 2d __, 2011 WL 4005324, at *13 (D.D.C. Sept. 9, 2011) (rejecting consideration of press articles containing "the statements of journalists, 'experts,' or even unofficial or unidentified sources"), or has speculated about the contents of the documents, *see, e.g.*, *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) (noting that "mere public speculation" about the contents of requested records will not compel their release).  Rather, the actual, entire contents of the requested records are available to the public, and the government's response to this lawsuit has explicitly confirmed their authenticity.

Thus, the actual "harm" inquiry at this point is exceedingly narrow.  The question before this Court is whether release of records *already* in the public domain and *already* confirmed to be authentic government documents would somehow cause damage to the nation.  The government's declaration provides no answer on this point, but that is no mere oversight.  The Walter Declaration is silent because no government official could conceivably swear to this Court that releasing records that are already public and whose authenticity is beyond question would cause additional national security harm.  The government identifies no relevant harms because there would be none, and the continued classification of the requested records is without basis.  This Court must order the withheld documents declassified and released in full.

### C.    This Court Should Review the Withheld Records In Camera

In its summary judgment brief, the government pretends that the requested records are not already in the public domain.  *See* Gov't Br. 15–16 ("To the extent Plaintiffs allege that a prior unauthorized disclosure could affect the protected status of the information withheld by the Department – *even if such an unauthorized disclosure did exist* – they are incorrect." (emphasis

added)).  This is astonishing.  But the government's willful blindness need not impede the

Court's proper resolution of this case.  By reviewing the withheld records *in camera* and

comparing them with the cables released by Wikileaks and attached to the accompanying

Wessler Declaration, this Court can independently determine that the withheld documents are

identical to materials already in the public domain.  Once the Court has established that the

cables are already in the public domain, it must hold that any harm that might flow from public

access to the records has already occurred, as discussed above.

  In reviewing the validity of an exemption claim, a court "may examine the contents of

such agency records in camera to determine whether such records or any part thereof shall be

withheld."  5 U.S.C. § 552(a)(4)(B).  The decision whether to undertake *in camera* review is left

to the trial court's discretion.  *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998).

  Summary judgment without *in camera* review is appropriate only where the

government's affidavits "provide specific information sufficient to place the documents within

the exemption category, if this information is not contradicted in the record, and if there is no

evidence in the record of agency bad faith."  *Ctr. for Auto Safety v. Envtl. Prot. Agency*, 731 F.2d

16, 22 (D.C. Cir. 1984).  "While in camera examination need not be automatic, in many

situations it will plainly be necessary and appropriate."  *Ray v. Turner*, 587 F.2d 1187, 1191

(D.C. Cir. 1978) (quoting the Conference Report on the 1974 FOIA amendments, S. Rep. No.

93-1200 at 2 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6285, 6287) (internal quotation marks

omitted).  "The ultimate criterion is simply this: Whether the district judge believes that *in*

*camera* inspection is needed in order to make a responsible *de novo* determination on the claims

21

of exemption."[14] *Spirko*, 147 F.3d at 996 (quoting *Ray*, 587 F.2d at 1195) (internal quotation marks omitted).

The Walter Declaration omits all discussion of the prior public release of the requested records, and its apparent position that the records are not already in the public domain is controverted by Plaintiffs' record evidence.  *In camera* review of the withheld documents is therefore appropriate and will aid the Court's resolution of the case.  Undertaking the simple expedient of *in camera* review of the 23 documents at issue here will allow the Court quickly to confirm that the cables already available to the public are identical to the cables the State Department seeks to withhold, and that the government's Exemption 1 claim is meritless.

> **D.    The Government has Waived its Ability to Withhold the Requested Records by Officially Confirming their Authenticity**

Even if the government could somehow show that releasing the requested records in full would cause some sort of harm to the national security—which it emphatically cannot—its Exemption 1 claim would fail because it has officially confirmed the authenticity of the cables. The government argues that there has been no official disclosure of the requested records, and thus that the State Department has not waived its right to withhold the records.  Gov't Br. 15–18. The government is correct in the narrow sense that it has not yet *itself* released the full contents of each of the requested records.  However, by its response to this litigation and the prior

---

[14] The court of appeals has suggested that the agency's submission of "affidavits [that] are insufficiently detailed to permit meaningful review of exemption claims" constitutes a "circumstance[] under which it would be error for the district court *not* to review the documents *in camera*." *Spirko*, 147 F.3d at 996 (emphasis in original); *see also Quinon v. Fed. Bureau of Investigation*, 86 F.3d 1222, 1229 (D.C. Cir. 1996) ("[W]here an agency's affidavits merely state in conclusory terms that documents are exempt from disclosure, an *in camera* review is *necessary*." (emphasis added)).  A trial judge may even order *in camera* review merely "on the basis of an uneasiness, on a doubt he wants satisfied before he takes responsibility for a *de novo* determination."  *Ray*, 587 F.2d at 1195; *see also Meeropol v. Meese*, 790 F.2d 942, 958 (D.C. Cir. 1986) (same).

statements of its officials, the State Department has officially confirmed the existence,

provenance, and authenticity of all 23 requested records. That eliminates any legitimate ground

for DOS to withhold the records from public release.

"[W]hen information has been officially acknowledged [or disclosed], its disclosure may

be compelled even over an agency's otherwise valid exemption claim." *Wolf v. CIA*, 473 F.3d

370, 378 (D.C. Cir. 2007) (internal quotation marks omitted) (quoting *Fitzgibbon v. CIA*, 911

F.2d 755, 765 (D.C. Cir. 1990)); *see also Pub. Citizen v. Dep't of State,* 11 F.3d 198, 201–02

(D.C. Cir. 1993). "[A]n official acknowledgment must meet three criteria:  First, the information

requested must be as specific as the information previously released.  Second, the information

requested must match the information previously disclosed . . . .  Third, . . . the information

requested must already have been made public through an official and documented disclosure."

*Wolf*, 473 F.3d at 378 (alterations in original).  Unofficial disclosures or the simple presence of

information in the public domain are insufficient to override an agency's withholding claim. *Id.*;

*Pub. Citizen*, 11 F.3d at 203.

As detailed above, the State Department's response to this litigation has specifically

confirmed the authenticity of the 23 cables subject to Plaintiffs' Request. [15]  Secretary of State

---

[15] The Walter Declaration acknowledges the existence of each cable requested by
Plaintiffs, and shares details about its contents that confirm the authenticity of the version of the
cable disseminated by Wikileaks. *See* Walter Decl. ¶¶ 35–76.  For example, the Walter
Declaration describes Document E4 as a "telegram[] reporting on sensitive diplomatic
communications with, and assessments of, particular policies of the governments of Switzerland
and Liechtenstein." Walter Decl. ¶ 47.  It further states:  "Document E4 is telegram 141 dated
January 20, 2006 from the US Embassy in Bern to the Department of State.  It is seven
pages . . . ." *Id.* ¶ 48.  Attached to the accompanying Wessler Declaration is Cable 06Bern141
taken from the cache of cables published by Wikileaks. Wessler Decl. Ex. W.  That cable carries
the unique Message Reference Number 141, is dated January 20, 2006, originated in the U.S.
Embassy in Bern, and discusses policies and actions of the governments of Switzerland and
Liechtenstein and comments by Swiss officials. *See id.*  The cable requested by Plaintiffs and

Hillary Rodham Clinton and other officials have also acknowledged that Wikileaks published a large number of embassy cables that were originally produced by State Department employees and stored on government computer networks.  These on-the-record acknowledgements waive the State Department's ability to withhold the requested records pursuant to Exemption 1.  The State Department's acknowledgements of the authenticity of the cables published by Wikileaks and requested by Plaintiffs were "official and documented," and the information requested is as specific as and matches the information previously released.  *See Wolf*, 473 F.3d at 378.  The government's confirmation of the existence and origin of the requested records functions to transform the unofficial release of the cables by Wikileaks into an official acknowledgement that waives DOS's withholding claim.

The government maintains that until it officially releases the full text of each requested record, it can "preserve[] some increment of doubt regarding the reliability of the publicly available information" and that the publicly available text of the cables might "be ignored by foreign governments."  Gov't Br. 16–17 (citations omitted).  Those arguments would be sound in the normal case where the contents of the requested records have been the subject of mere speculation in the press or even where the documents have been leaked but the government has not confirmed their authenticity.  Here, however, the State Department has explicitly acknowledged that the cables published by Wikileaks are government documents, and that the particular cables requested here are authentic State Department communications.  And foreign

---

the cable identified in the State Department's search are a match.  This is true of each of the requested cables.

Further, if there were any doubt as to the authenticity of the requested cables, the State Department's partial release of 11 of them demonstrates that the cables held by the government are word-for-word matches with the cables disseminated by Wikileaks.  *Compare* Wessler Decl. Exs. F–P, R–S (partially redacted cables released by DOS), *with id.* Exs. T–W, AB–AC, AI, AK–AM, AR (full text of same 11 cables).

governments have not ignored these cables.  To the contrary, they have decried the revelation of private diplomatic conversations and in some cases demanded—and received—apologies.[16] These facts distinguish this case from those cited by the government, and function to waive the State Department's withholding claim.

## II.     The Government's Exemptions 6 and 7 Claims Must Fail

In addition to its blanket withholding claims under Exemption 1, the State Department has also withheld certain information pursuant to Exemptions 6, 7(A), 7(C), and 7(D).  Because the requested records are already in the public domain, and because the Walter Declaration provides insufficient explanations for withholding, the Court should deny summary judgment to the government on its claims that Exemptions 6 and 7 justify withholding of information from release.

### A.     The Government's Invocation of Exemptions 6 and 7(C) Fails Because the Records are Already in the Public Domain and the Balance of Interests Tips Toward Disclosure

Exemption 6 allows withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  "To determine what constitutes a 'clearly unwarranted invasion of personal privacy,' the court must 'balance the individual's right of privacy against the basic policy of opening agency action to the light of public scrutiny.'"  *Int'l Counsel Bureau*, 723 F. Supp. 2d at 65–66 (quoting *Nat'l Ass'n of Home Builders,* 309 F.3d at 32).  "Exemption 6's requirement that

---

[16] *See, e.g.*, Michele Kelemen, *Learning What Officials Really Think, Via WikiLeaks*, Nat'l Pub. Radio, Nov. 30, 2010, http://n.pr/ggEpW6 ("[Turkish foreign minister] Davutoglu seemed satisfied with the personal apology he got yesterday from Secretary Clinton."); CBS Evening News, Nov. 28, 2010, 2010 WLNR 23696620 ("Secretary of State Hillary Clinton whose department has known for some time which confidential documents WikiLeaks was planning to release spent much of last week in damage control mode.  Clinton called officials in Germany, France, Canada, China, Saudi Arabia, the Gulf States and Afghanistan to offer apologies in advance."); *see also* note 12, *supra* (collecting reports of dissatisfied responses of foreign governments).

disclosure be 'clearly unwarranted' instructs [courts] to tilt the balance (of disclosure interests against privacy interests) in favor of disclosure.  This exemption creates a heavy burden; indeed, under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act." *Morley v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (internal quotation marks and citations omitted).  "To establish that the release of information contained in government files would result in a clearly unwarranted invasion of privacy, the court first asks whether disclosure 'would compromise a substantial, as opposed to a *de minimis*, privacy interest.'"  *Nat'l Ass'n of Home Builders*, 309 F.3d at 331.  If there is a significant privacy interest implicated, then courts must weigh that privacy interest against the public interest in disclosure, defined as "the extent to which disclosure of the information sought would she[d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Bibles v. Oregon Natural Desert Ass'n*, 519 U.S. 355, 355–56 (1997) (per curiam) (internal quotation marks omitted) (alteration in original).

Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the[ir] production . . . (C) could reasonably be expected to constitute an  unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7).  Thus, the "threshold question" in Exemption 7 cases "is whether the [information] was 'compiled for law enforcement purposes.'"  *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 926 (D.C. Cir. 2003).  The D.C. Circuit applies a two-part test to determine whether "records are law enforcement records: the investigatory activity that gave rise to the documents is 'related to the enforcement of federal laws,' and there is a rational nexus between the investigation at issue and the agency's law enforcement duties." *Jefferson v. Dep't of Justice*, 284 F.3d 172, 177 (D.C. Cir. 2002).  Like Exemption 6, Exemption 7(C) requires courts

to balance the privacy interest of the person named in the records against the public interest in

their disclosure. *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749,

762 (1989). However, "'Exemption 7(C) is more protective of privacy than Exemption 6' and

thus establishes a lower bar for withholding material." *Am. Civil Liberties Union v. U.S. Dep't*

*of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011).

The government's invocation of Exemptions 6 and 7(C) cannot survive because the prior

public disclosure of the requested records has vitiated any privacy interest in them. Indeed, the

D.C. Circuit has held in a case raising an Exemption 7(C) claim that "the government cannot rely

on an otherwise valid exemption claim to justify withholding information that has been

'officially acknowledged' or is in the 'public domain.'" *Davis v. U.S. Dep't of Justice*, 968 F.2d

1276, 1279 (D.C. Cir. 1992).

Public disclosure of the identity of a person named in a requested government record

reduces that person's privacy interest in the document. *Kimberlin v. Dep't of Justice*, 139 F.3d

944, 949 (D.C. Cir. 1998) ("[The named individual's] statement to the press undoubtedly does

diminish his interest in privacy: the public already knows who he is, what he was accused of, and

that he received a relatively mild sanction."); *Blanton v. Dep't of Justice*, 64 F. App'x 787, 789

(D.C. Cir. 2003) (per curiam) (unpublished) ("[P]ublic disclosure of an individual's involvement

in an investigation will reduce the privacy interest."). Thus, when a person discloses his or her

own involvement in a matter, such "public disclosures effectively waive [the person's] right to

redaction of his name from documents on events that he has publicly discussed." *Nation*

*Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995). Analogously, when the

entire requested record is already in the public domain, there is no privacy interest left to protect.

*Cf. Reporters Comm.*, 489 U.S. at 764 (noting that if the requested records "were freely available

27

[to the public], there would be no reason to invoke the FOIA to obtain access to the information they contain"; correspondingly, there would be no reason to withhold the records under FOIA); *Am. Civil Liberties Union*, 655 F.3d at 9 ("The fact that information about these proceedings is readily available to the public reduces further still the incursion on privacy resulting from disclosure.").

To be sure, not every public revelation of a fact contained in a record will compel release over an Exemption 6 or 7(C) privacy claim. But this case is distinguishable from those holding that narrower disclosures fail to preclude application of the privacy exemptions. Thus, although "publicity in the popular media" consisting of "journalistic speculation" cannot override FOIA's privacy protections because the "accuracy [of such reports are] not established," *Bast v. Dep't of Justice*, 665 F.2d 1251, 1255 (D.C. Cir. 1981); *see also Edmonds v. Fed. Bureau of Investigation*, 272 F. Supp. 2d 35, 53 (D.D.C. 2003), there is no such speculation here. Rather, there is a prior public release of the full contents of the requested records. Likewise, the previous "scattered disclosure of the bits of information contained in a rap sheet" does not compel "revelation of the rap sheet as a whole" under Exemption 7(C), because the comprehensive criminal history compiled by the government in the rap sheet is not "freely available" to the general public, and thus there are privacy interests left to protect. *Reporters Comm.*, 489 U.S. at 764; *see also Kimberlin*, 139 F.3d at 949 (holding that a person's statement to the press revealing that he had been investigated and disciplined, but not disclosing "the details of the investigation, of his misconduct, and of his punishment" did not require release of a report providing those details). Here, however, the entire contents of the requested records *are* freely and ubiquitously available to the public, meaning no privacy interest is served by withholding the records from release. *See Am. Civil Liberties Union*, 655 F.3d at 10–11 (holding

that the easy availability of court records revealing the "fact that particular individuals have been convicted of or pled guilty to crimes" diminishes the privacy interest in that information in other government records).  This is also not a case where the information requested was "at one time public" but is no longer so.  *Reporters Comm.*, 489 U.S. at 767; *Reed v. Nat'l Labor Relations Bd.*, 927 F.2d 1249, 1251 (D.C. Cir. 1991).  Rather, the contents of the requested records are currently available on multiple websites, including those of major newspapers, and are firmly lodged in the public domain.  *See Am. Civil Liberties Union*, 655 F.3d at 12 ("Nor will disclosure under FOIA make that information any more accessible than it already is through publicly available computerized databases.  At most, it will simply provide one more place in which a computerized search will find the same person's name and conviction . . . .").

Therefore, because the full cables are already in the public domain, and confirmed as authentic, any remaining privacy interest of the named individuals in those documents is nil. Paradoxically, the government's response to Plaintiffs' Request may actually cause harm to the privacy interests of the individuals concerned.  By invoking Exemptions 6 and 7 as to specific information in the cables, the government has provided a roadmap of exactly what information it deems most intrusive.  The government knows—even if it is loathe to admit—that the full contents of each cable are already in the public domain, allowing members of the public to match the government's exemption claims with the particular names and passages to which they are applied.  By elevating its prerogatives over common sense, the government has in fact *highlighted* the identities of the individuals whose privacy it purports to protect.  It has, most emphatically, not protected them.[17]

_____

[17] The government would have been wise to exercise its discretion in not invoking every FOIA exemption to which it has a colorable (if unsustainable) claim.  *See Bartholdi Cable Co., Inc. v. Fed. Commc'ns Comm'n*, 114 F.3d 274, 282 (D.C. Cir. 1997) ("The

Moreover, even if Wikileaks had never released the cables and the government never confirmed their authenticity, the Exemption 6 and 7(C) claims would still fail because the strong public interest in disclosure outweighs the privacy interests invoked by the government. Documents E1 (Cable 05Paris1699), E4 (Cable 06Bern141), E11 (Cable 07Tripoli943), and E24 (Cable 09Riyadh670), to which Exemptions 6 and 7(C) have been applied, all implicate matters of significant public concern.  Document E1 concerns the investigation and detention in France of two former Guantanamo detainees and reveals information provided by French investigating judge Jean-Francois Ricard.  *See* Wessler Decl. Exs. F, T.  The fate of former Guantanamo detainees, including those repatriated to France, is an issue of significant public interest.[18]

The government has withheld two sentences from Document E4 pursuant to Exemption 6.  The first sentence reveals that the Swiss government has been investigating the whereabouts of a Swiss citizen, Mohamed Ben Hedi, in connection with a 2002 bombing.  *See* Wessler Decl. Ex. I, at ¶ 6 (partially redacted cable released by DOS); *id.* Ex. X (full text of cable).  The public has an acute interest in U.S. allies'—including Switzerland's—efforts to respond to and

---

fact that information falls within one of the FOIA exemptions does not necessarily mean that the agency cannot disclose the material.  FOIA's exemptions simply permit, but do not require, an agency to withhold exempted information from the public.").  By invoking the privacy exemptions, the government reveals more than it would have by simply releasing the withheld records in full.

[18] *See, e.g.*, Pierre-Antoine Souchard, *WikiLeaks Cited in French Guantanamo Trial*, Associated Press, Jan. 20, 2011, http://bit.ly/A9VZxk ("Lawyers for ex-inmates of the Guantanamo prison camp used documents released by WikiLeaks to argue for their acquittal in a French terrorism trial Thursday."); Steven Erlanger, *Terror Convictions Overturned in France*, N.Y. Times, Feb. 24, 2009, http://nyti.ms/qzMbU ("A French appeals court on Tuesday overturned terrorist conspiracy convictions for five former inmates of the Guantánamo Bay prison who were tried and convicted in 2007, after they were returned to France."); *France Convicts 5 Former Guantánamo Inmates*, N.Y. Times, Dec. 20, 2007, http://nyti.ms/AxIxCM; Craig S. Smith, *6 Former Guantánamo Detainees on Trial in Paris*, N.Y. Times, July 4, 2006, http://bit.ly/A6i9A9; John Tagliabue, *France: Man Held At Guantánamo Freed*, N.Y. Times, Mar. 11, 2005, http://bit.ly/wWqEia.

investigate acts of terrorism.[19]   The second sentence withheld from Document E4 pursuant to Exemption 6 is located in paragraph 9 of the cable, *id.* Ex. I, at ¶ 9, and reads: "He is sometimes hailed as a moderate, at other times attacked as a wolf in sheep's clothing, putting a palatable front to fundamentalist activities."  *Id.* Ex. X, at ¶ 9.  The Walter Declaration provides no explanation why this sentence should be withheld under Exemption 6.  *See* Walter Decl. ¶ 50. The mere invocation of an exemption, without any accompanying explanation, is insufficient to carry the government's burden.  *See Vaughn v. Rosen*, 484 F.2d 820, 826–27 (D.C. Cir. 1973); *Maydak v. U.S. Dep't of Justice*, 218 F.3d 760, 765 (D.C. Cir. 2000) ("[C]ursory, equivocal, and inconsistent assertions [of exemptions] are clearly inadequate . . . .").

The Walter Declaration contends that Document E11 is exempt from disclosure under Exemption 6 because it "contains information about the physical health of a person and its release would constitute a clearly unwarranted invasion of personal privacy" and that "[t]here is no public interest associated in releasing this information."  Walter Decl. ¶ 69.  The Declaration's contention that there is no public interest in the information is flatly incorrect. Document E11 concerns the United States' attempts to follow up on complaints that a former Guantanamo detainee who had been repatriated to Libya, Muhammad Abdallah Mansur al-Rimi, sustained injury to his left arm during interrogation at Guantanamo.  As this Court has held, there is a substantial public interest in the treatment of detainees at Guantanamo:

> The [agency] contends that there is no public interest in these photographs [of Guantanamo detainees].  The Court disagrees.  The press has taken a substantial interest in the Guantanamo Bay detainees, and has reported extensively on them and their condition.  Indeed, as Judge Hogan has noted, "[p]ublic interest in Guantanamo Bay generally . . . has been unwavering."  The Court need not linger

---

[19] *See, e.g.*, *Swiss Hold 3 in Plot Against I.B.M.*, N.Y. Times, Apr. 26, 2010, http://nyti.ms/dtdzaa; *Swiss Suspend Qaeda Case*, N.Y. Times, June 2, 2005, http://nyti.ms/Am4pai; Don Van Natta Jr. & Desmond Butler, *How Tiny Swiss Cellphone Chips Helped Track Global Terror Web*, N.Y. Times, Mar. 4, 2004, http://nyti.ms/yuxWuh.

> on this point to conclude that photographs of these detainees taken at Guantanamo
> Bay are of significant public interest.

*Int'l Counsel Bureau*, 723 F. Supp. 2d at 66 (quoting *In re Guantanamo Bay Detainee Litig.*, 624 F. Supp. 2d 27, 37 (D.D.C. 2009)) (citations to record omitted); *see also Am. Civil Liberties Union v. Dep't of Def.*, 389 F. Supp. 2d 547, 573 (S.D.N.Y. 2005) (concluding that there is a substantial public interest in photos that shed light on abuse of detainees in U.S. custody).  Even if the former detainee named in the cable has a privacy interest—despite the fact that the full cable is already public—in the withholding of his identifying information, *see Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 286 (2d Cir. 2009), there is a substantial public interest in the substance of the allegation of abuse contained in the cable, as well as the cable's discussion of the U.S. government's efforts to investigate the former detainee's complaint.  Both of these subjects relate to government activities, and shed light on alleged government misconduct and efforts to respond to it.  They therefore may not be withheld under Exemption 6.

Finally, Document E24 describes a meeting between U.S. Ambassador Richard Holbrooke, the Saudi Assistant Minister of the Interior, Prince Mohammed bin Nayef, and other U.S. and Saudi officials.  *See* Wessler Decl. Ex. AO (full text of cable).  There is a public interest in knowing the names of the participants in the meeting.  The attendees are high-ranking government officials who were discussing issues of interest to the public, including President Obama's decision to oppose release of photographs of abuse of detainees in U.S. custody.  *See id.* Ex. AO, at ¶ 17.  The public has a heightened interest in knowing the names of high-level government officials, particularly their discussions about withholding other matters of public interest from public view.  *Cf. Stern v. Fed. Bureau of Investigation*, 737 F.2d 84, 93–94 (D.C. Cir. 1984); *Lurie v. Dep't of Army*, 970 F. Supp. 19, 37 (D.D.C. 1997) ("[T]he higher the rank

and the more prominent the position of the official accused of wrongdoing, the greater the public interest in disclosure.").

Of course, the privacy interests against which these public interests are balanced are much diminished because the cables are public and their authenticity has been confirmed. The government's stated rationales for withholding therefore fail. As to Document E1, the Walter Declaration states that disclosure of Ricard's and others' names would invade their personal privacy "because it would reveal these individual's [sic] involvement in providing confidential law enforcement information to the U.S. Government." Walter Decl. ¶ 42. However, those individuals' names and involvement are already revealed in the text of the cables currently in the public domain. Regarding Document E4, the Walter Declaration justifies withholding of the sentence about Ben Hedi on the basis that "it has not been publicly known that the individual was investigated by Swiss authorities at that time." *Id.* ¶ 50. To the contrary, this fact has been publicly known since May 2011, when Wikileaks published the full text of the cable in question. Wessler Decl. Ex. X. The government also ignores that public availability of Document E11. And for Document E24, the government justifies withholding on the basis that "the individuals and their identifying titles have not previously been released publicly." Walter Decl. ¶ 74. Again, this is incorrect, as the contents of the cable have been public since they were released by Wikileaks in December 2010 (with limited redactions) and again in September 2011 (in full). Wessler Decl. Exs. AN–AO. The strong public interest in disclosure outweighs the *de minimus* privacy interests in the withheld information, and there is no basis for the government's withholding claims.

**B.      The Government's Invocation of Exemptions 7(A) and 7(D) Fails Because the Prior Public Release of the Requested Records Vitiates the Government's Arguments**

The State Department also invokes Exemptions 7(A) and 7(D).  Those exemptions allow withholding of

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, . . . [or] (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source . . . .

5 U.S.C. § 552(b)(7).  Exemption 7(A) requires either a "presently pending 'enforcement proceeding'" or a likelihood that the "investigation is likely to lead to such proceedings."  *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926.  Exemption 7(D) requires that "information was furnished by a confidential source during the course of a legitimate law enforcement investigation."  *Williams v. Fed. Bureau of Investigation*, 69 F.3d 1155, 1159 (D.C. Cir. 1995).  "A source is confidential within the meaning of exemption 7(D) if the source provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred."  *Id.* (internal quotation marks omitted).

The State Department invokes Exemption 7(A) as to one paragraph of Document E4 (Cable 06Bern141), which describes a Swiss investigation of Swiss citizen Mohamed Ben Hedi.  *See* Wessler Decl. Ex. I, at ¶ 6 (cable released in part by DOS); *id.* Ex. X, at ¶ 6 (full text of cable).  The Walter Declaration justifies this exemption by explaining that "[t]he disclosure of this information could reasonably be expected to interfere with law enforcement proceedings, as the individuals named (or any accomplices) may have been unaware of such an investigation."  Walter Decl. ¶ 50.  Whether or not Ben Hedi was aware of an investigation prior to the public

34

disclosure of this cable by Wikileaks, he was clearly put on notice of the existence of an investigation in May 2011, when the full text of the cable became public. The government's rationale for withholding is therefore controverted by facts in the record. In fact, the only thing the government has achieved by invoking Exemption 7(A) is to inform Ben Hedi that he is *still* "subject to ongoing investigation." *Id.* If there is any interference with law enforcement proceedings at issue here, it has been caused by the government's response to Plaintiffs' request, not by the specter of government release of records already accessible to Ben Hedi.

The State Department has withheld portions of four cables pursuant to Exemption 7(D). It withholds the "names of law enforcement officials who provided information sensitive to specific foreign governments" from Documents E1 (Cable 05Paris1699), E2 (Cable 05Paris3118), and E10 (Cable 07Madrid1805). The government justifies this withholding on the basis that disclosure of those names "would reveal the identity of a confidential source." Walter Decl. ¶ 42. The names of those sources have already been revealed in the cables published by Wikileaks, however, and so disclosure of the requested records will reveal nothing new. The FOIA statute requires that release of the records "could reasonably be expected to *disclose* the identity of a confidential source." 5 U.S.C. § 552(b)(7)(D) (emphasis added). It is unreasonable to believe production of the cables will "disclose" anything because the identities of the once-confidential sources are already known.

Document E18 (Cable 08Ottawa918) describes a discussion between a State Department official and Canadian Security Intelligence Service Director Jim Judd. The Walter Declaration states that the "law enforcement individual identified [in the cable] *and* the information provided" are exempt from disclosure under Exemption 7(D). Walter Decl. ¶ 64 (emphasis added). While the government might have been able to advance a colorable basis for

withholding Judd's name—were it not for the previous public release of the entire cable—it has no basis for withholding the substantive information provided by Judd because that information would not "disclose the *identity* of a confidential source." 5 U.S.C. § 552(b)(7)(D) (emphasis added). In any event, the prior disclosure of the full contents of the cable has vitiated any expectation of confidentiality. Like the other documents withheld under Exemptions 7(A) and 7(D), Document E18 must be released in full.

### III.   The Court Should Grant Plaintiffs' Cross-Motion for Summary Judgment for the Same Reasons It Should Deny Defendant's Motion

The same reasons that make Defendant's motion for summary judgment meritless support Plaintiffs' cross-motion for summary judgment. The fact that disclosure of records that are already in the public domain and whose authenticity the government has officially confirmed would cause no damage to national security means that the records are not properly classified, precluding withholding under Exemption 1. *See* 5 U.S.C. § 552(b)(1). Prior disclosure of the records also undermines the Exemption 6 and 7 claims. Because the government has no valid basis for withholding, Plaintiffs' cross-motion for summary judgment should be granted.

### CONCLUSION

For the foregoing reasons, the Court should deny the Department of State's motion for summary judgment, grant Plaintiffs' cross-motion for summary judgment, and order DOS to release in full all 23 records responsive to Plaintiffs' request. In the alternative, and at a minimum, the Court should order the State Department to supplement the Walter Declaration with an explanation why prior public release and official acknowledgment of the records does not compel their disclosure under FOIA.

Respectfully submitted,

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, DC 20008
Tel: (202) 457-0800
Fax: (202) 452-1868
artspitzer@gmail.com

  /s/ Ben Wizner
Ben Wizner
Nathan Freed Wessler
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
Fax: (212) 549-2654
bwizner@aclu.org
nwessler@aclu.org

January 23, 2012                    *Counsel for Plaintiffs*